1

2

3                    **UNITED STATES DISTRICT COURT**

4                  **NORTHERN DISTRICT OF CALIFORNIA**

5                          **SAN JOSE DIVISION**

6

7    LEONDRE PAIGE,                          Case No. 20-cv-07378-BLF

                    Plaintiff,
8                                            **ORDER DENYING PETITION FOR**
           v.                                **WRIT OF HABEAS CORPUS**
9
                                             [Re: ECF 1]
     KATHLEEN ALLISON, Acting Director,
10   CDCR,

11                  Defendant.

12          A jury convicted Petitioner Leondre Paige of first-degree murder (Cal. Penal Code § 187(a))

13   and found that he intentionally discharged a firearm causing great bodily injury or death (§

14   12022.53(b)-(d)). Petition ("Pet.") at 1, ECF 1; Response ("Resp.") at 1, ECF 10-1; ECF 10, Ex. 1B

15   at 314-18; ECF 10, Ex. 3C at 663-66. Paige was sentenced to a total term of fifty years to life in

16   prison. Pet. at 1; Resp. at 1; ECF 10, Ex. 1B at 317-20; ECF 10, Ex. 3C at 685.

17          Paige subsequently, and unsuccessfully, pursued direct review in California state court. Pet.

18   at 2; Resp. at 1-2. On appeal, Paige argued his trial was plagued by prosecutorial misconduct and

19   ineffective assistance of counsel. ECF 10, Ex. 4 at 25-45 ("Opening Brief on Appeal"). On May 25,

20   2018, the California Court of Appeal remanded for the trial court to consider resentencing under the

21   amended firearm enhancement statute, but otherwise affirmed the judgment in a reasoned opinion.

22   ECF 10, Ex. 7 ("Court of Appeal Opinion"). The California Supreme Court summarily denied

23   Paige's petition for review. ECF 10, Ex. 9.

24

25

United States District Court
Northern District of California

On September 3, 2019, Paige filed a petition for writ of habeas corpus in California Superior Court. ECF 10, Ex. 10 ("Petition to the Superior Court"); *see also* Resp., n. 1 (discussing timing of petition). On September 19, 2019, The Superior Court issued a reasoned opinion rejecting Paige's claims that there was insufficient evidence supporting his conviction and that appellate counsel was ineffective. ECF 10, Ex. 11 ("Superior Court Opinion"). The Superior Court also addressed and dismissed Paige's argument that trial counsel should have secured the testimony of an expert witness regarding Paige's intoxication. *Id.* at 10. Paige then filed a petition for writ of habeas corpus in the California Court of Appeal, ECF 10, Ex. 12 ("Petition to the Court of Appeal"), and a subsequent petition in the California Supreme Court, ECF 10, Ex. 14 ("Petition to the California Supreme Court"). Each of these petitions was summarily denied. ECF 10, Ex. 13 ("Court of Appeal Habeas Order"); ECF 10, Ex. 15 ("California Supreme Court Habeas Order").

This matter now comes before the Court on a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). Having considered the parties' submissions, the record in the case, and the applicable law, the Court DENIES the petition.

## I. BACKGROUND

The following facts, presumed to be correct under 28 U.S.C. § 2254(e), are excerpted from the California Court of Appeal's decision on direct appeal. *See Brown v. Horell*, 644 F.3d 969, 972 (9th Cir. 2011)[1]:

> **BACKGROUND**
>
> On June 13, 2011, Dante Burch went to see Carlos Bradford who lived at an apartment complex in San Leandro. Burch and Carlos were friends from the neighborhood, and Carlos used to sell marijuana to Burch "all the time." Burch pulled up in his car with music blaring, which upset Carlos who tried to tell him to lower the volume, as he did not want to disturb his neighbors.

---

[1] The factual findings of the Court of Appeal are substantially the same as the factual findings of the Superior Court. Superior Court Opinion at 2 n. 2 ("Unless otherwise indicated, all facts are culled from the appellate opinion.").

United States District Court
Northern District of California

Around midday the next day, Burch returned with his girlfriend Alexis Johns to purchase some marijuana from Carlos, but Carlos was on his "way to pick up some more weed," so he told Burch he did not have any. After that, Burch called Carlos a " 'bitch ass nigger,' " and Carlos returned the insult. Burch then got out of his car and the two began fighting. A friend of Carlos came over to break up the fight, and Burch "got mad" thinking the two "jumped on him." Burch was "highly upset," and stated he was " 'about to get my boys since you got your boys.' " Burch left and called defendant because he wanted somebody to "have [his] back" and make sure he "didn't get jumped again." Defendant was with his cousin Chadrick Frazier, Daquan Lane and Tyrell Ewing. The four of them had been drinking alcohol and smoking marijuana since "about 10, 11" in the morning. Burch picked up defendant, Ewing, Lane, and Frazier in east Oakland and they, along with Johns and Burch's cousin Janae Johnson, who Burch had picked up beforehand, drove back toward San Leandro.

On the way, Burch asked if anyone had a gun, and defendant confirmed he did. According to Burch, it "was a black gun with [an] extended clip" or "magazine." The group stopped at a liquor store near the apartment complex. There, Burch got the gun from defendant and put it in the pocket of his sweatpants. After defendant made a purchase at the store, Johns, Lane and Johnson decided to walk over to the apartment complex, while defendant, Frazier, Ewing, and Burch followed after in the car.

At this point, it was around 4:00 or 5:00 in the afternoon, and there was a barbecue going on at the complex. Burch parked his car in his spot, and he, defendant, Ewing and Frazier exited the vehicle. Carlos and "all his boys" were there along with a group of girls. Carlos and "his boys" started walking toward Burch and defendant, so Burch "pulled the gun out and gave it back to [defendant]," telling him, "I'm about to fight dude." Burch and Carlos then got into a "verbal confrontation," exchanging "[b]ad words, cussing, arguing." By that point, "at least 30 people" were outside watching the events unfold. Just as the confrontation was escalating, Carlos's brother Danny pulled up in the parking lot.

Carlos "came at [Burch] to start the fight." Burch kicked and punched Carlos, then got him into a "headlock," and Burch was "trying to swing him to the ground." Danny, who was 6'3, 260 pounds and described as a "big guy," "all muscle," came over and "knocked [Burch] down with one punch." Carlos fell on top of him. Both men then heard gunfire. Burch got up, checked himself for wounds and saw defendant "running with a gun in his hand." Danny took off his shirt, said " '[t]his nigga shot me,' " and collapsed to the ground. A woman at the scene was a nurse and administered aid, until emergency personnel arrived. Meanwhile, Burch fled the scene but was arrested shortly after police found him hiding on the back patio of an apartment. Burch had been on probation and served 70 days for a violation but was later released, until three years later when he was

arrested for murder. Frazier, Lane and Ewing all ran in the same direction ending up at Bayfair Mall.

Deputies were dispatched to the scene after reports of gunfire. Upon arrival, deputies located Danny who was suffering from multiple gunshot wounds. Danny was transported to a hospital where he was later pronounced dead.

Defendant had also run from the scene. He called his friend LaDay Anderson to ask for a ride. She picked him up and took him to Oakland. Defendant then left the Bay Area and "went to a few different states," including Louisiana because he "knew the police were going to be looking for [him.]" Defendant was "on the run for almost three years," before he was arrested in Sacramento.

Defendant was charged by information with one count of murder (§ 187, subd. (a)). It was further alleged he personally discharged a firearm causing great bodily injury (§§ 12022.5, subd. (a), 12022.53, subds. (b)–(d), (g), 12022.7) and that this was a second strike offense (§§ 1170.12, subd. (c)(1), 667, subd. (e)(1)).

At trial, Antoinette Pashell (commonly referred to as Shay Shay) testified she saw Burch and Carlos arguing, when defendant called out to her. Defendant and Pashell had gone to middle school together. She walked over to defendant, gave him a hug, and "felt something hard" near his back pocket; she was not "quite sure if it was a gun or a bottle." She then went back to her apartment. Pashell was reluctant to come to court because where she was from, "you don't talk to the police."

Chioma Iweka was also a reluctant witness and thought the prosecutor was " 'putting [her] in danger' " by talking to her. Before trial she told both law enforcement and the prosecutor that the man Pashell hugged was the man who shot Danny. At trial, Iweka testified she did not recall having said that to police, but she did remember telling them "the person that Shay Shay gave a hug to you know came with [Burch]" to the scene.

Burch testified that he did not kill Danny, rather they were all good friends, "hung out together, barbecues together, watched each other's kids." Burch said he saw defendant running with a gun, it was the same gun defendant had had earlier, and he had not "seen anybody else with a gun that day." He also said, when getting up off the ground, he asked something "like, 'Who shooting?' Or, 'Why shooting?' " By the time Burch testified, he had taken a deal in regard to Danny's murder whereby he pleaded guilty to second degree murder and if he came "here today and t[old] the truth, it will get dropped to a manslaughter and receive no more than nine years." He said when he was first arrested he "lied about everything," and even during the preliminary hearing he "was a little truthful, but [he] wasn't 100 percent truthful." At that time, he was "not supposed to cooperate with the police" and he was just trying to "protect" defendant. However, as trial approached, Burch decided to talk to the district attorney who in turn made it "clear . . . that this was the last chance [and Burch] had to be honest."

Tyrell Ewing testified that when he was interviewed by police he identified defendant as the shooter.

Daquan Lane testified Burch asked if anyone "had a strap, a gun" when he picked up Lane, defendant, Ewing, and Frazier, and that defendant stated he had a gun. Lane confirmed he saw defendant pull "an all black gun with an extended clip," from his waistband and point the gun at Danny. Further, he confirmed that he, defendant, Ewing, and Frazier drank alcohol and "used marijuana regularly," and started smoking about "noon till—till nighttime," on the day of the shooting. Lane acknowledged he was testifying pursuant to a deal whereby he had pled guilty in another case to first degree murder for a "maximum of six years in state prison," if he came to court and told the truth.

Defendant's "blood" cousin Chadrick Frazier also testified. He testified that "after shots rang out," Burch asked defendant " 'Why you do that?' " He claimed not to recall previously telling the prosecutor that Burch had directed that question to defendant and that defendant had had a gun. He also claimed not to recall that he had previously said that the shots came from his right and defendant was standing to his right. Frazier did testify that he, defendant, Lane, and Ewing had been smoking marijuana and drinking alcohol that day and that based on his observations, defendant was under the influence. Frazier acknowledged he "would rather not be involved" with the case, that he had been crying before he testified, and he did not want to say what had happened. He also acknowledged he had made a deal with the district attorney "that if [he] came and told the truth, [his] sister wouldn't have to come" in to testify.

Inspector Caesar Basa testified that when he and the district attorney had interviewed Frazier, Frazier told them the shots came from his right, but had not wanted to identify who was standing to his right. Instead, he hunched over and started to cry. Eventually, he said defendant was standing there. He also told them defendant was holding a black gun with an extended magazine, and that Burch had exclaimed, " 'Why'd you shoot?' " Frazier continued to cry throughout the interview.

Defendant testified on his own behalf, admitting that he shot Danny but that his intention was that he "just wanted to scare him," as he "was scared for, you know, my friend." He confirmed he "had a black 9 millimeter semi-automatic" gun with "an extended clip." He did not know if Danny had a weapon, but saw Danny go to the trunk of his car and thought Danny "was trying to receive a weapon or something."

Defense counsel presented no other rebuttal evidence.

The jury found defendant guilty of murder in the first degree and further found he personally and intentionally discharged his firearm. The trial court sentenced defendant to 50 years to life (25 years to life for the first degree murder conviction and a consecutive 25-years-to-life sentence for the personal use of a firearm enhancement).

5

Court of Appeal Opinion at 2-6 (footnotes omitted) (alterations in original).

## II.      LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant habeas relief unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). In addition, the federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 (9th Cir. 2019).

The U.S. Supreme Court has made clear that § 2254(d)(1) consists of two distinct clauses. *Williams*, 529 U.S. at 412–13. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Id*. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. It is important, however, that a federal court not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly." *Id*. at 411. The pertinent question is whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

For the purposes of both clauses, "clearly established Federal law" consists of Supreme Court holdings (excluding dicta) existing at the time of the relevant state court decision, because only the Supreme Court's holdings are binding on the state courts. *See Williams*, 529 U.S. at 412. Circuit law may nevertheless be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

As apparent from the foregoing, AEDPA sets forth a highly deferential standard for evaluating state court rulings: it requires a state prisoner "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Moreover, even if a petitioner establishes a constitutional violation under the relevant standard, that is only the first hurdle the petitioner must clear. Habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Davis v. Ayala*, 576 U.S. 257, 267 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Davis*, 567 at 267-68 (internal quotations omitted).

With these principles in mind, the Court now addresses Paige's claims.

### III.    DISCUSSION

Paige asserts the following claims for relief:

1     1.  The prosecutor engaged in misconduct during the evidentiary phase of trial and the State's closing argument.

2.  Defense counsel was ineffective in failing to object to the prosecutorial misconduct during the evidentiary phase of trial and during the State's closing argument.

3.  Defense counsel was ineffective for failing to retain a toxicologist to opine on Petitioner's voluntary intoxication and mental state at the time of the crime.

The Court addresses the claims *seriatim*. As to each, the Court considers whether there has been a constitutional violation and if so, whether any error was prejudicial.

### A.  Prosecutorial Misconduct

Paige first argues the prosecutor at his trial "impermissibly injected his own personal beliefs and opinions into evidence." Pet. at 18-25. According to Paige, the prosecutor did so by vouching for the credibility of witnesses Burch, Frazier, Lane, and Inspector Basa. *Id*. at 18-25. Paige also claims the prosecutor committed misconduct during closing argument by misstating the applicable law, equating a "not guilty" verdict with a finding of innocence, and urging the jury to consider the consequences of their verdict. *Id*. at 25-29.

Paige's prosecutorial misconduct claim was raised on direct appeal. Opening Brief on Appeal at 27-42. The Court of Appeal denied the claim in a reasoned opinion. Court of Appeal Opinion at 6. Paige did not raise the prosecutorial misconduct claim in the Petition to the Superior Court nor the Petition to the Court of Appeal. While Paige raised the claim in his Petition to the Supreme Court of California, Petition to the California Supreme Court at 4-5, the court denied the claim without issuing a reasoned opinion, California Supreme Court Habeas Order. When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion to analyze whether the state judgment was erroneous under the standard of § 2254(d). *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). This Court thus considers the Court of Appeal's opinion on direct appeal.

United States District Court
Northern District of California

1    The Court of Appeal found the prosecutorial misconduct claim procedurally defaulted

2    because defense counsel did not make contemporaneous objections at trial. Court of Appeal Opinion

3    at 6-7 (citing *People v. Brown*, 31 Cal. 4th 518, 533 (2003), *as modified* (Oct. 29, 2003) ("To

4    preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely

5    objection, make known the basis for his objection, and ask the trial court to admonish the jury.")).

6    The Court of Appeal did not reach the merits of Paige's misconduct claims. Court of Appeal Opinion

7    at 6.

8    The procedural default doctrine "'bar[s] federal habeas [review] when a state court declined

9    to address a prisoner's federal claims because the prisoner had failed to meet a state procedural

10   requirement.'" *Calderon v. United States District Court*, 96 F.3d 1126, 1129 (9th Cir. 1996)

11   (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). Federal courts "'will not review a

12   question of federal law decided by a state court if the decision of that court rests on a state law

13   ground that is independent of the federal question and adequate to support the judgment.'" *Id.*

14   Because procedural default is an affirmative defense, the respondent must first adequately plead an

15   independent and adequate state procedural ground for the procedural default. *Bennett*

16   *v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). To qualify as "'adequate,'" a state rule must be

17   "'firmly established and regularly followed.'" *Walker v. Martin*, 562 U.S. 307, 316 (2011) (quoting

18   *Beard v. Kindler*, 558 U.S. 53, 60 (2009)). A rule is inadequate only if it is applied in a surprising

19   or unfair manner that operates to discriminate against federal claims. *Id.* at 319-20. Once the

20   government has established the adequacy of the procedural default, the burden shifts to the

21   petitioner, who must then "assert[] specific factual allegations that demonstrate the inadequacy of

22   the state procedure, including citation to authority demonstrating inconsistent application of the

23   rule." *Bennett*, 322 F.3d at 586.

24   Respondent argues that California's contemporaneous objection rule is firmly established

25   and regularly followed. Resp. at 6-7. In Respondent's view, Paige's misconduct claims cannot be

United States District Court
Northern District of California

reviewed by this Court. *Id.* (citing *Coleman*, 501 U.S. at 729). To support this argument, Respondent points out that federal courts, including the Supreme Court and the Ninth Circuit, have repeatedly recognized the contemporaneous objection rule constitutes a valid procedural default. Resp. at 7 (citing *Ylst*, 501 U.S. at 799, 806 (failure to object to introduction of testimony from custodial interview lacking *Miranda* warnings); *Zapien v. Martel*, 805 F.3d 862, 868 n. 2 (9th Cir. 2015) (failure to object to witness statements to police); *Zapata v. Vasquez*, 788 F.3d 1106, 1112 (9th Cir. 2015) (failure to object to prosecutorial misconduct in closing argument); *Fairbanks v. Ayers*, 650 F.3d 1243, 1256 (9th Cir. 2011) (failure to object to introduction of prejudicial evidence); *Bonin v. Calderon*, 59 F.3d 815, 842-843 (9th Cir. 1995) (failure to object to testimony on grounds that prosecutor promised not to use statements)). The Court finds the contemporaneous objection rule is firmly established and regularly followed. Respondent has adequately pled the existence of an independent and adequate state ground for the procedural default of Paige's misconduct claims.

In the Traverse, Paige does not challenge Respondent's showing that the procedural ground is adequate. *See generally* Traverse (discussing ineffective assistance of counsel claims); *see also* Pet. at 29 ("Paige's trial counsel failed to object to any of the above acts of misconduct by the prosecutor and thus forfeited his claims of prosecutorial misconduct."). Were Paige to challenge the adequacy of the state procedural rule, he would bear the burden of asserting factual allegations demonstrating the inadequacy of the state procedure. *Bennett*, 322 F.3d at 585-86. He has failed to even attempt to do so. Because Paige has not challenged the adequacy of the state procedure, his prosecutorial misconduct claim fails. *See Coleman*, 501 U.S. at 729-730.

**B.     Ineffective Assistance of Counsel: Failure to Object to Alleged Prosecutorial Misconduct**

Petitioner next contends that he was deprived of his Sixth Amendment right to effective assistance of counsel at trial. Pet. at 29-32. This claim is derived from trial counsel's failure to object to the prosecutorial misconduct discussed above. *Id.* at 29 (incorporating allegations of prosecutorial

United States District Court
Northern District of California

1   misconduct into ineffective assistance of counsel claim); *see also id*. at 18-29 (describing

2   misconduct). According to Paige, there was a reasonable probability of a better result at trial had

3   counsel performed sufficiently. Pet. at 29-32.

4          To garner relief on a claim of ineffective assistance of counsel, a defendant must show: (1)

5   his attorney provided deficient performance and (2) that prejudice ensued as a result. *Strickland*,

6   466 U.S. at 687-96. To establish deficient performance, the defendant must show "counsel's

7   representation fell below an objective standard of reasonableness." *Id*. at 688. A court considering

8   a claim of ineffective assistance must apply a "strong presumption" that counsel's representation

9   fell within the "wide range" of reasonable professional assistance. *Id*. at 689. In other words, a

10  reviewing court's scrutiny of counsel's actions or omissions is highly deferential when evaluating

11  allegations of deficient performance. *Id*. "A fair assessment of attorney performance requires that

12  every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances

13  of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

14  time." *Id*.

15         The defendant carries the burden of demonstrating that counsel made errors so serious that

16  he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Id*. at 687. The

17  issue is not what the best lawyer would have done, or even what a majority of good lawyers would

18  have done, but whether some reasonable lawyer could have acted in the challenged manner when

19  facing the same circumstances as counsel in the present case. *Coleman v. Calderon*, 150 F.3d 1105,

20  1113 (9th Cir. 1998), *rev'd on other grounds*, *Coleman v. Calderon,* 525 U.S. 141 (1998). The

21  inquiry into counsel's performance is "extremely limited." *Id*. Before determining whether

22  counsel's performance was deficient for failing to object to alleged prosecutorial misconduct, the

23  reviewing court must first consider "whether the prosecutor's remarks constituted objectionable

24  misconduct." *Zapata*, 788 F.3d at 1112.

25

United States District Court
Northern District of California

Additionally, under AEDPA, the pivotal question is whether the state court's application of the *Strickland* either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. . . . A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101. Thus, a federal habeas court must use "a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

           1.    <u>Failure to Object to the Prosecutor Injecting His Own Personal Beliefs and Opinions into Evidence and Vouching for the Credibility of the State's Witnesses</u>

Paige argues he was deprived of his right to effective assistance of counsel at trial because his counsel failed to object to several instances of prosecutorial misconduct during the evidentiary phase of trial. Pet. at 29-32. Paige first points to the prosecutor impermissibly vouching for the credibility of government witnesses Burch, Lane, and Frazier. *Id*. at 18-25. Paige further notes several instances of alleged misconduct during Inspector Basa's testimony which suggested "the prosecutor believed Frazier's pre-trial statements were true, and the prosecutor further believed that Burch was less culpable than Paige." Pet. at 22. Finally, Paige argues another exchange with Inspector Basa was improper because Inspector Basa "proffer[ed] the prosecutor's protocols and methods into the evidentiary phase of this case so as to suggest that the prosecutor knew how to distinguish credible from incredulous witnesses." *Id.* at 23. According to Paige, trial counsel failed to object to any of this alleged misconduct, rendering him ineffective. Pet. at 29.

Paige's ineffective assistance of counsel claim resulting from counsel's failure to object to the prosecutor's questioning of Burch, Lane, Frazier, and Inspector Basa was raised on direct appeal.

12

Opening Brief on Appeal at 41-42. The Court of Appeal was the only state court to address the claim in a reasoned opinion. Court of Appeal Opinion at 7-11. Paige did not raise the claim in his Petition to the Superior Court nor in his Petition to the Court of Appeal. While Paige did raise the claim in his Petition to the California Supreme Court, Petition to the California Supreme Court at 131, the court summarily denied the claim, California Supreme Court Habeas Order. Accordingly, the Court will "look through" the California Supreme Court summary denial and consider the reasoning of the California Court of Appeal. *See Wilson*, 138 S. Ct. at 1192; *Ylst*, 501 U.S. at 806.

The appellate court rejected Petitioner's ineffective assistance of counsel claims related to impermissible vouching as follows:

> **Prosecutorial Misconduct**
> Defendant asserts the prosecutor committed misconduct while questioning Burch, Lane, Frazier and Inspector Basa by "impermissibly injecting his own personal beliefs and opinions into evidence, and by vouching for the credibility" of those witnesses. Defendant also contends the prosecutor committed misconduct on "multiple occasions" during his closing argument. He additionally maintains the cumulative effect of the alleged misconduct deprived him of his due process rights.
> **Forfeiture**
> Defendant made no objection in the trial court to any of the prosecutor's conduct he now challenges on appeal. He has thus forfeited any asserted errors in this regard on appeal. (*People v. Brown* (2003) 31 Cal.4th 518, 553 ["To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis for his objection, and ask the trial court to admonish the jury."].)
> Anticipating forfeiture, defendant alternatively contends the failure of his attorney to object resulted in ineffective assistance of counsel.
> "When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice. . . ." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)
> In considering a claim of ineffective assistance of counsel, it is not necessary to determine, ' "whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an

United States District Court
Northern District of California

13

ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." ' (*In re Fields* (1990) 51 Cal.3d 1063, 1079, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 697.) To establish the requisite prejudice, "[i]t is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different." (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.)

### Alleged "Vouching"
#### Burch's Testimony

During Burch's examination, the prosecutor inquired, "Did I tell you that if I thought you were lying, what was going to happen," to which Burch answered "You were going to take me to trial." The prosecutor went on to ask if Burch told him everything he could recall in their initial meeting and if he was truthful to which Burch replied, "Yes, sir." The following colloquy occurred:

"[People:] Did I ask you if you wanted to essentially ride this train to the end, meaning sit over there and go to trial and roll the dice?

"[Burch:] Yes, sir.

"[People:] What did you say?

"[Burch:] 'No, sir.'

"[People:] Was that because you didn't shoot anybody?

"[Burch:] Yes, sir.

"[People:] Was that because you didn't want Danny to get killed?

"[Burch:] Yes, sir.

"[People:] Now, you've agreed to take nine years as long as you're truthful. You understand that you have some liability because you made a phone call to those boys, right?

"[Burch:] Yes, sir

"[People:] If you could take it back, would you?

"[Burch:] Yes, sir.

"[People:] Do you understand that testifying, you're now cooperating?

"[Burch:] Yes, sir.

"[People:] So based on your earlier testimony, what does that make you?

"[Burch:] A snitch. [¶] . . . [¶]

"[People:] You've been truthful with us here today?

"[Burch:] Yes, sir."

Defendant asserts the "above testimony was elicited by the prosecutor immediately after Burch described the shooting and identified appellant as the shooter, and the unmistakable import of this exchange was that the prosecutor personally believed Burch when he incriminated appellant and the prosecutor gave him a plea deal as a result," which defendant contends constituted impermissibly injecting his own personal beliefs and impermissible vouching.

14

United States District Court
Northern District of California

***Lane's Testimony***

Lane confirmed the district attorney had spoken to him and another district attorney about his own first degree murder case about three weeks before trial. The prosecutor then inquired, "And did I tell you that a lot of [the deal] depended on whether you're going to be honest, right?" to which Lane replied, "Yes." Counsel continued by asking if Lane, "then answer[ed] all of the questions that both myself and the other lawyer asked," and Lane replied, "Yes, sir." Finally, the prosecutor asked, "And were you honest?" to which Lane once again replied, "Yes, sir."

Defendant notes this exchange occurred after Lane identified defendant as the shooter and described the weapon defendant used. On appeal, he contends "the unmistakable import of the . . . testimony, particularly in light of the prior testimony from Burch and Frazier, was that the prosecutor believed Lane was being honest in his pre-trial statements that incriminated appellant in the shooting" and this constituted impermissible injecting of his opinions into evidence and impermissible vouching.

Later, during Lane's testimony, the prosecutor began to ask, "Now, in terms of the deal that you made when I came and talked to you, did I tell you that the only reason I want to talk to you is, I didn't think that." At that point, defense counsel objected to the question as "[l]eading and suggestive," and the trial court sustained the objection. The trial court similarly sustained defense counsel's objection to the prosecutor's next attempted question—"Did I tell you that—did I say anything about whether I was going to give you a deal because I didn't think you were"—for the same reason. Defendant also contends this was an "attempt by the prosecutor to again inject himself, his opinions, and his own sense of justice into the evidence."

***Frazier's Testimony***

During Frazier's testimony, the prosecutor asked, "Downstairs, did I tell you because you were honest about [Burch], asking why did he shoot, '[t]hat's why I gave [Burch] a deal'?" and "I told you, 'Just because you're honest—' [¶] . . . [¶] 'that you helped out [Burch] about being honest,' right?" Frazier responded, "Yes" to both questions.

Defendant asserts this exchange, corroborating Burch's testimony, shows the prosecutor again "personally believed Frazier was being honest . . . and that was part of the reason the prosecutor gave Burch a plea deal," and this constituted impermissible injecting his own opinions and beliefs and impermissible vouching.

Generally, "[i]mpermissible 'vouching' may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony." (*People v. Fierro* (1991) 1 Cal.4th 173, 211, disapproved on other grounds in *People v. Thomas* (2012) 54 Cal.4th 908, 941.) Similarly, evidence of a prosecutor's subjective motivations when prosecuting a case is not relevant, for "[i]t is misconduct for

prosecutors to bolster their case 'by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it.' [Citation.] Similarly, it is misconduct 'to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness.' [Citation.] The vice of such remarks is that they 'may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 336 (*Bonilla*).)

It is not improper, however, for a prosecutor to question a prosecution witness about a plea deal he or she has entered into in exchange for his or her testimony at trial. Such deals also invariably turn on a witness testifying "truthfully." Accordingly, letting the jury know that a witness has assured the prosecutor he or she is telling the truth does not constitute impermissible vouching. (*Bonilla*, *supra*, 41 Cal.4th at pp. 336–337; *People v. Frye* (1998) 18 Cal.4th 894, 971–972, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Price* (2017) 8 Cal.App.5th 409, 461 [rejecting claim of impermissible vouching where prosecutor asked witness to " 'testify about what he told her would happen if he believed she was lying' "].)

Thus, there was nothing improper in the prosecutor eliciting testimony by Burch, Lane and Frazier that they were testifying pursuant to plea deals in connection with which they had promised to tell the truth during their trial testimony. We must observe, however, that the prosecutor's questioning in this regard was far more prolonged than necessary to make the point that each of these witnesses had entered into a plea deal wherein he agreed to testify for the prosecution and to do so truthfully, and the questioning came perilously close to crossing the line and constituting vouching.

### Inspector Basa's Testimony

Defendant contends two exchanges between the prosecutor and Inspector Basa constituted misconduct. The first occurred when the prosecutor asked Basa about a conversation the two had after interviewing Frazier, namely that when Frazier told them Burch asked defendant " 'Why'd you shoot?' " It was the first instance in which they had heard of that question being asked. The prosecutor went on to ask Basa, "And did I tell you that, to me, it meant that Dante wasn't as culpable as we initially thought?" and Basa responded "Yes, sir." The second exchange occurred when Basa went on to testify as to the prosecutor's interview style—that he does not tell interviewees "any specifics," but merely asks them questions—and that in the joint interviews they usually did not record conversations as it "decrease[s] the chance[s] that people are going to talk to you," and that in the approximate 20 interviews the two conducted together they informed the interviewees they were not being recorded. Basa also acknowledged the two did not take notes of the conversation as that distracts the witnesses.

1
2
3
4

Defendant contends the first exchange constituted impermissible vouching and the second impermissibly portrayed the prosecutor "as an experienced and noble seeker of the truth, and it ultimately also had the effect of inviting the jury to trust the prosecutor's version of the truth and to defer to the prosecutor's superior legal knowledge and experience rather than exercising their own independent judgment."

5
6
7

We agree that this questioning by the prosecutor was improper. Neither the prosecutor's personal opinion as to the extent of Burch's culpability nor the prosecutor's personal interview style was relevant, and the only significance that can be attached to this testimony is that it was an effort to bolster the prosecutor's belief in the strength of the case.

8
9
10
11

Despite the prosecutor's missteps in questioning Lane, Frazier, Burch and Inspector Basa, the testimony elicited went toward the veracity of Lane, Frazier, and Burch's testimony either identifying defendant as the shooter or identifying the weapon defendant used to shoot Danny. However, defendant, himself, took the stand and corroborated this testimony. Accordingly, even if there was prosecutorial misconduct, there was no possible prejudice to defendant.

12
13
14
15
16

Court of Appeal Opinion at 6-11 (alterations in original). In other words, the Court of Appeal concluded that trial counsel was not constitutionally ineffective because (1) the prosecutor did not err in questioning Lane, Frazier, and Burch, and that such questioning was not prejudicial to Paige, and (2) while the prosecutor erred in questioning Inspector Basa, such questioning was not prejudicial to Paige. *Id*.

17
18
19
20
21
22
23
24
25

The Court finds that the Court of Appeal reasonably applied *Strickland* in rejecting petitioner's present ineffective assistance claim. *See* 28 U.S.C. § 2254(d)(1). The state court reasonably concluded that trial counsel's failure to object to the prosecutor's questioning of Lane, Frazier, Burch, and Inspector Basa did not run afoul of *Strickland* because any improper questioning did not prejudice Paige. Court of Appeal Opinion at 6-11; *see also Strickland*, 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). This conclusion is supported by the Court of Appeal's finding that the testimony of Lane, Frazier, Burch, and Inspector Basa primarily served to identify Paige as the

shooter or to identify the weapon Paige used to shoot Danny Bradford. Court of Appeal Opinion at 11. The Court of Appeal explained that because Paige himself took the stand and corroborated this testimony, trial counsel's failure to object to the prosecutor's questioning was not prejudicial. *Id*.

The testimony cited by Paige in his Petition confirms the soundness of the Court of Appeal's conclusion. In Paige's words, his defense "conceded the identity of the shooter, and instead relied on *why* Paige shot. Why Paige shot was decided by his testimony versus those who were in observance of the event– namely, Burch, [Frazier], and Lane." Traverse at 4 (emphasis in original); *see also* Pet. at 31 ("Paige did ultimately testify he committed the shooting which reduced the prejudice from some of the prosecutor's improper vouching during the evidentiary phase of trial"). And the testimony Paige cites by Lane, Frazier, Burch, and Inspector Basa largely serves to identify Paige as the shooter or identify the weapon Paige used to shoot Danny Bradford. For example, Paige argues that the prosecutor elicited improper testimony vouching for Burch's credibility "immediately after Burch described the shooting and identified Paige as the shooter." Pet. at 20. Paige argues that "[a]n obvious reading of the exchange was that the prosecutor personally believed Burch when he incriminated Paige," but Paige does not identify any non-identification testimony by Burch that was improperly bolstered by the prosecution's vouching. *See also* Court of Appeal Opinion at 8, 11 (rejecting same argument). Paige similarly fails to point the Court to prejudicial testimony by Lane, Frazier, or Inspector Basa that was improperly bolstered by the prosecution's vouching. Instead, Paige identifies testimony by Lane, Frazier, or Inspector Basa that generally aligns with Paige's own testimony. *Compare* Pet. at 13 ("Lane testified he saw Paige holding a black gun with an extended clip in his right hand"), 21 (identifying testimony by Frazier that "after the shooting, Burch asked Paige why Paige shot the victim"), and 22 (identifying testimony by Inspector Basa about a conversation Inspector Basa had with the prosecutor regarding "Frazier's statement regarding Burch asking Paige why he shot the victim") *with id*. at 6 ("Defendant testified on his own behalf, admitting that he shot Danny but that his intention was that he 'just wanted to scare him,' as

18

he 'was scared for, you know, my friend.' He confirmed he "had a black 9 millimeter semi-automatic" gun with 'an extended clip.'").

This showing fails to overcome the Court of Appeal's conclusion that any impermissible vouching was not prejudicial because the witnesses did not testify to anything untoward to which Paige himself did not testify. Paige does not point to any testimony by Burch, Frazier, Lane or Inspector Basa regarding Paige's motive or state of mind when shooting Danny Bradford. Nor does he direct the Court to any testimony from Burch, Frazier, Lane, or Inspector Basa that suggested Paige had shot Bradford "without legal justification or cause." Traverse at 4. And none of the "witnesses's versions were [a] direct rebuttal for Paige's variance on the same events." *Id*. Because the shooter's identity was not at issue, the state court's holding—that the testimony garnered by the prosecution bolstering the credibility of witnesses was not prejudicial—was reasonable in light of the evidence presented and the defense's theory of the case.

In sum, the state court's decision cannot be said to be contrary to, or an unreasonable application of, clearly established federal law as decided by the Supreme Court nor was it based on an unreasonable determination of the facts considering the evidence presented. *See* 28 U.S.C. § 2254(d).

### 2. Failure to Object to Alleged Prosecutorial Misconduct During Closing Arguments

Paige also argues he was deprived of his right to effective assistance of counsel at trial because his counsel failed to object when the prosecutor misstated the law during closing arguments on three separate occasions. Pet. at 29 (raising ineffective assistance claim); *id*. at 25-27 (discussing misconduct). The first alleged misstatement occurred when the prosecutor incorrectly explained implied malice to the jury. *Id*. at 25. The second alleged misstatement occurred when the prosecutor discussed voluntary manslaughter and misstated the crime's requisite intent. *Id*. at 26. The third alleged misstatement occurred when the prosecutor misstated the law regarding voluntary

1  manslaughter and imperfect self-defense. *Id*. at 26-27. Paige further argues defense counsel was

2  ineffective for failing to object when the prosecution improperly asked the jury to consider the

3  consequences of its verdict and equated a verdict of not guilty to one of innocence. Pet. at 29 (raising

4  ineffective assistance claim); *id*. at 27-29 (discussing misconduct).

5       Paige raised this claim on direct appeal, Opening Brief on Appeal at 41-42, and in his

6  Petition to the California Supreme Court, Petition to the California Supreme Court at 5. Paige did

7  not raise this claim in his Petition to the Superior Court nor in his Petition to the Court of Appeal.

8  Because the California Supreme Court denied the petition without issuing an opinion and the

9  Superior Court did not address the claim, the Court must "look through" to the Court of Appeal

10  Opinion, the "last related state-court decision that does provide a relevant rationale." *Wilson*, 138 S.

11  Ct. at 1192; *see also Ylst*, 501 U.S. at 806

12       On direct appeal, the California Court of Appeal rejected Paige's claim as follows:

13          ***Remarks During Closing Argument***
        ***"Misstatements" of the Law***

14         ***First***, while giving an example of second degree murder, the
prosecutor stated, "Let's say that there's a conversation. Hey, I bet

15  you I can shoot a bullet in between those people and not hit anybody.
No, you can't. No, no, watch. I take a gun, and I fire at a crowd. All

16  right. And I hit somebody, and I kill somebody. All right. The law
says you need an intentional act . . . that it's dangerous to human life,

17  . . . that you deal with the knowledge of danger. Everybody knows
you point at a crowd, pull the trigger, it's dangerous. And you do it

18  with conscious disregard. The law says under those circumstances,
that qualifies as a second degree murder. I didn't have any intent to

19  kill, I shouldn't be convicted of a murder is my position. I wasn't
trying to hit anybody. But certain acts are so dangerous, the law says,

20  no, you *knew or you should have known* what the consequences were
going to be." (Italics added.)

21         Defendant asserts the italicized portion misstated the law
because "[i]mplied malice requires the defendant actually know his

22  conduct was dangerous to human life." We agree the prosecutor
misspoke. (See *People v. Knoller* (2007) 41 Cal.4th 139, 143

23  [defining implied malice as " ' "an act, the natural consequences of
which are dangerous to life, which act was deliberately performed by

24  a person who knows that his conduct endangers the life of another and
who acts with conscious disregard for life" ' "].)

25

United States District Court
Northern District of California

United States District Court
Northern District of California

However, the prosecutor went on to give a second example, which defendant does not challenge: "Another textbook example. Movie theatre full of people. I run in and I say, fire, fire, fire, I start screaming. There's no fire. I cause a panic, people start running for the exits, somebody gets trampled and dies. Is it an intentional act? Absolutely. Is it dangerous to human life. . . ? You know it's dangerous, done with [the] knowledge of the danger? Of course I know it's dangerous. That's why I did it. I wanted to see what would happen. Conscious disregard. You know what's happening, and you do it anyway. [¶] The law says that's implied malice. Certain acts are so dangerous to human life and are so clearly dangerous that if you do them, you're doing them independent of the danger, you don't care."

Given the entirety of the prosecutor's illustration and that the jury was correctly instructed on the law and told that if the attorneys made any assertion that was contrary to the court's instructions, the instructions controlled, the error in connection with the prosecutor's first example was not prejudicial. (See *People v. Osband* (1996) 13 Cal.4th 622, 717 [when argument is contrary to instructions, we ordinarily presume jury followed instructions].)

**Second**, the prosecutor stated "I'll spend a little bit of time and talk about how you sort of have factors in mitigation [of murder], so to speak, to get to [] manslaughter. It's a limited concept. I say limited because, otherwise, anybody can come in and just make something up about, A, you know, I was angry when I did this; or, you know, it was a sudden fight; and, I didn't know what was going on. It's an unlawful killing without malice. *No intent to kill, no express malice, no implied malice*. All right. [¶] There are two types, generally. Sudden quarrel or heat of passion. . . ."

Defendant contends the italicized statement was "legally erroneous because as recently held by our Supreme Court, the crime of voluntary manslaughter in fact requires either an intent to kill or a conscious disregard for life, i.e., implied malice."

In our view, defendant misreads what the prosecutor was saying. The prosecutor was characterizing *defendant's* position—i.e., that *he* had no intent to kill, *he* had no express malice and *he* had no implied malice. In short, we do not read this passage as any pronouncement on the law by the prosecutor.

In any case, the jury was also instructed on voluntary manslaughter and on both express and implied malice. And, as we have observed above, the jury was instructed that if the attorneys made any assertion that was contrary to the court's instructions, the instructions controlled. Accordingly, even if the prosecutor's statement could reasonably be understood as a statement on the law, any erroneous legal assertion was not prejudicial.

**Third**, when the prosecutor tried to respond to defendant's defense theory of the case—imperfect self-defense—he stated: The defense says "I didn't intend to kill him, I just wanted to scare him, and I was afraid for my friend. . . . [¶] Right? That's the starting point.

21

Defendant's words. . . . The problem for him is that the law says that a manslaughter, for every type of manslaughter is an objective standard. It's not subjective. It's an objective standard based on a reasonable person of an average disposition. Otherwise, like I said, it's a limited concept, but if we don't have an objective standard based on reasonable person and an average disposition, then the exception meets the rule. Anybody can come in and say, well, you know, it may not be reasonable what I did, but I thought it was reasonable."

Defendant asserts this "argument improperly suggested the jury could not find [the defendant] guilty of the lesser included offense of voluntary manslaughter based on imperfect self-defense [*sic*] unless they found appellant acted reasonably."

The court gave CALCRIM instruction No. 571, which states, in relevant part: "The difference between complete defense of another and imperfect defense of another depends on whether the defendant's belief in the need to use deadly force *was reasonable*," and "[t]he defendant acted in imperfect defense of another if: [¶] 1. He actually believed that Dante Burch was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. He actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

Viewed in context with this instruction, which defendant does not challenge, the absolute best that can be said about the prosecutor's argument is that it was obtuse and confusing. Clearly, it would have been far preferable if the prosecutor had focused on the three elements of the defense and used the language of the instruction.

However, again, any error in the prosecutor's argument was not prejudicial. The jury was instructed on voluntary manslaughter and the imperfect defense of another and heat of passion defenses, as well as on express and implied malice. We must presume the jury followed those instructions.

### *Urging Jury to Consider Consequences*

Defendant claims the prosecutor also improperly asked the jury to "consider the consequences and punishments that would result from their verdict." Citing *People v. Lloyd* (2015) 236 Cal.App.4th 49 (*Lloyd*), he contends the prosecutor impermissibly equated finding him not guilty on the basis of his defense of another, with finding him " 'innocent.' "

In his opening argument, the prosecutor stated: "So, defense of another. To be clear, defense of another means you're saying this man should walk out the door. Defense of another, according to the law, is an absolute defense. Oh, he had a right to shoot him. He had a right to kill him, so he's absolutely not, *not only just not guilty, he's innocent*. If you decide that defense of another applies, you're saying, I was justified, I get to go home now. That's what defense of another is. It's not a manslaughter. It's an absolute defense. So let's talk about that." (Italics added.) He similarly asserted: "Daniel Bradford was shot four times. His life ended on June 14th, 2011. He doesn't get to

go home to his family anymore. Defendant's response is: Send me home, send me home. I don't think you're going to do that."

In his final closing, the prosecutor argued: "The defense in this case is [defendant] had an absolute right to shoot Danny Bradford. He should go home." And similarly, "Now, upon reflection, Danny Bradford, the terrible irony is, Danny Bradford jumped in to protect his brother. He did it the way old school people know, with his fists. He jumped in, punched [Burch], and now his defense is, well, I didn't want to jump in because he's too big, so it's okay if I shot him. He went there to jump in, and he didn't. So his position is, I get to end Daniel Bradford for jumping in. . . . And you should give him a pass for not jumping in."

In *Lloyd*, *supra*, 236 Cal.App.4th 49, the Court of Appeal concluded the prosecutor committed misconduct by "repeatedly" arguing in ways that "diminished the reasonable doubt standard," both during her closing and rebuttal arguments by misstating the reasonable doubt standard when she stated, for instance, " 'If you find there is self- defense, you are saying his actions, the defendant's conduct was absolutely acceptable,' " and " '[Defense counsel] talks about, you know, voting not guilty is not saying that you condone his behavior. Well, what does not guilty mean? It means you didn't commit a crime.' " (*Id.* at pp. 52, 62.) The appellate court also concluded this misconduct was prejudicial, given other errors that occurred and because of the "close[ness]" of the case. (*Id.* at pp. 52, 62–64.)

Here, defense counsel asserted in his closing argument that: "Our position is, my client, based on the law as applied to the facts is arguably not guilty of any crime. That the homicide . . . was justifiable."

It thus appears the prosecutor was anticipating and responding to defendant's defense theory. Nevertheless, "[a] not guilty verdict is not the equivalent of finding the defendant innocent. [Citation.] A not guilty verdict simply means the prosecution did not prove the defendant's guilt beyond a reasonable doubt." (*Lloyd*, *supra*, 236 Cal.App.4th at p. 62; *Kansas v. Marsh* (2006) 548 U.S. 163, 180, fn. 7.) The prosecutor's assertions during closing arguments are markedly similar to those made by the prosecutor in Lloyd and were improper for the reasons discussed in that case.

However, unlike *Lloyd*, this was not a "close case." (*Lloyd*, *supra*, 236 Cal.App.4th at p. 63.) On the contrary, given the overwhelming evidence against defendant, including his own testimony, it is not " 'reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1071.) Thus, even when considered cumulatively, the prosecutor's missteps in this case do not rise to the level of prejudicial error.

Court of Appeal Opinion at 12-16 (alterations in original).

United States District Court
Northern District of California

1

Paige has failed to show that the Court of Appeal's ruling is an unreasonable application of

2

clearly established federal law. In rejecting Paige's *Strickland* challenge, the Court of Appeal

3

reasonably found that none of the identified misstatements of law were prejudicial. Court of Appeal

4

Opinion at 12-14. This conclusion was based on the fact that "the jury was correctly instructed on

5

the law and told that if the attorneys made any assertion that was contrary to the court's instructions,

6

the instructions controlled." Court of Appeal Opinion at 13; *see also id* at 14. The Supreme Court

7

has explained that "juries are presumed to follow the court's instructions," *CSX Transportation, Inc.*

8

*v. Hensley*, 556 U.S. 838, 841 (2009), and that "arguments of counsel generally carry less weight

9

with a jury than do instructions from the court." *Boyde v. California*, 494 U.S. 370, 384 (1990).

10

Nowhere in his petition does Paige argue that the instructions given to the jury were incorrect.

11

In support of his challenge, Paige contends that the Court must consider whether "there is a

12

reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the

13

consideration of constitutionally relevant evidence." Pet. at 28 (citing *Boyde*, 484 U.S. at 380). But

14

Paige's argument misapplies *Boyde*. The petitioner in *Boyde* argued that a challenged *jury*

15

*instruction* was "ambiguous and therefore subject to an erroneous interpretation." 494 U.S. at 380.

16

Unlike the petitioner in *Boyde*, Paige does not challenge any of the instructions his jury received.

17

He instead challenges the closing arguments the prosecutor made at trial. Pet. at 26-32. Accordingly,

18

the standard of review Paige cites is not relevant to the inquiry here, which is whether the

19

"prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a

20

denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks

21

and citation omitted); *see* Resp. at 11-12. In light of this standard, the Court of Appeal reasonably

22

concluded that the prosecutor's comments were not prejudicial given the jury was correctly

23

instructed on the law and told that if the attorneys made any assertion that was contrary to the court's

24

instructions, the instructions controlled. Court of Appeal Opinion at 13; *see also id* at 14.

25

24

1      Paige also argues that his counsel was ineffective for failing to object when the prosecutor

2   urged the jury to consider the consequences of its verdict and to equate a verdict of not guilty or a

3   finding of self-defense with innocence. Pet. at 28-29. The Court of Appeal's agreed with Paige that

4   the relevant arguments were improper, Court of Appeal Opinion at 16 ("The prosecutor's assertions

5   during closing arguments are markedly similar to those made by the prosecutor in [*People v.*] *Lloyd*[,

6   236Cal.App.4th 49 (2015)] and were improper for the reasons discussed in that case."), but

7   ultimately rejected his appeal based on the second prong of *Strickland* due to the "overwhelming

8   evidence against defendant, including his own testimony." *Id.*

9      The question before the Court is whether it was objectively unreasonable for the Court of

10   Appeal's to find that counsel's failure to object was not sufficiently prejudicial to deprive Paige of

11   his constitutional rights. *See* 28 U.S.C. § 2254. The Court answers this question in the negative. The

12   Court of Appeal's finding that there was no reasonable probability of a more favorable outcome if

13   defense counsel had objected was not contrary to, nor an unreasonable application of, clearly

14   established federal law. The Court of Appeal's holding was reasonably supported by the analogy it

15   drew to *People v. Lloyd*, 236 Cal.App.4th 49 (2015) and its assessment of the evidence against Paige

16   as overwhelming. Court of Appeal Opinion at 15-16.

17      Paige fails to meaningfully grapple with this conclusion. For example, Paige contends that

18   "[t]he prosecutor should not use such arguments calculated to inflame the passions or prejudices of

19   the jury," Pet. at 28 (citing ABA Standards for Criminal Justice 3–5.8(c) (2d ed. 1980); *Berger v.*

20   *United States*, 295 U.S. 78, 88 (1935)), and that "argument wherein the prosecutor equated a finding

21   of self-defense with a finding that defendant was 'innocent' was clear misconduct," Pet. at 28 (citing

22   *Kansas v. Marsh*, 548 U.S. 163, 180, n. 7 (2006)). These arguments are unavailing as they concern

23   whether counsel was ineffective to object to alleged prosecutorial misconduct—the first prong of

24   *Strickland*. Indeed, the Court of Appeal acknowledged that the prosecutor's statements in closing

25

United States District Court
Northern District of California

United States District Court
Northern District of California

arguments were improper. Court of Appeal Opinion at 16. As explained above, the Court evaluates this claim under the second prong of *Strickland*.

While Paige implicitly addresses prejudice under *Strickland*'s second prong, his arguments are generalized and fail to address either the Court of Appeal's Opinion or the particular factual circumstances of his trial. Paige summarily contends that "every reasonable jurist would at least have a grave doubt about whether the misconduct substantially and injuriously influenced the verdict, a verdict can and should be reversed." Pet. at 29 (citing *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995)). He further argues that "far from involving 'ambiguous' statements that 'might or might not' affect the, the remarks at issue here were 'focused, unambiguous, and strong.'" *Id*. (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985)). However, he fails to explain why, in the context of the factual circumstances of his case, the Court of Appeal's application of *Strickland* was incorrect.

This Court's review of relevant caselaw only serves to affirm the reasonableness of the Court of Appeal's decision. In *Darden v. Wainwright,* the Supreme Court considered a habeas challenge to statements made by the prosecution during closing arguments of a trial. 477 U.S. at 179-182. These comments included referring to the defendant as an "animal"; adding that the defendant "shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash"; and the prosecutor saying he wanted to "see [the defendant] sitting here with no face, blown away by a shotgun." *Id*. at 180-81 nn. 11-12; *see also id*. at 180 nn. 9-10. The Supreme Court determined that the comments "undoubtedly were improper," but did not "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id*. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). In support of its conclusion, the Court highlighted that (1) "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense," (2) "[t]he trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone," (3) the evidence against the petitioner was so "heavy" that

it "reduced the likelihood that the jury's decision was influenced by argument," and (4) "defense counsel made the tactical decision not to present any witness other than petitioner." *Id*. at 182.

Similar factors are at play here.[2] The Court of Appeal found that the prosecutor's comments, while improper, "anticipat[ed] and respond[ed] to defendant's defense theory." Court of Appeal Opinion at 16. It also found that "the jury was instructed that if the attorneys made any assertion that was contrary to the court's instructions, the instructions controlled." Court of Appeal Opinion at 13. It further found that "given the overwhelming evidence against defendant, including his own testimony, it is not reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." *Id*. at 16 (internal quotation marks and citation omitted). In light of these factors, and the aforementioned caselaw, this Court cannot conclude that the Court of Appeal's decision was contrary to, or an unreasonable application of, *Strickland*. *See* 28 U.S.C. § 2254(d). Because the Court of Appeal reasonably concluded Paige did not face prejudice from his attorneys' failure to object to the certain statements in the prosecution's closing arguments, Paige's habeas claim fails.

### C.     Ineffective Assistance of Counsel: Failure to Investigate and Retain a Toxicologist to Review Paige's Intoxication

Paige claims that he was deprived of his right to effective assistance of counsel at trial because his counsel failed to retain a toxicologist who could investigate and testify about Paige's intoxication at the time of the shooting. Pet. at 32-35. Paige argues his counsel's failure to investigate and present evidence regarding his level of intoxication was particularly grave because "premeditation and deliberation were the factors considered by the jury so as to aggravate the

---

[2] A slightly different issue than the one addressed in *Darden* is before the Court; in *Darden* the Supreme Court considered prosecutorial misconduct while the Court now considers *counsel's failure to object* to prosecutorial misconduct. This distinction, while germane, does not blunt the soundness of the Court's conclusion. For counsel's failure to object to be prejudicial to Paige, the conduct to which counsel should have objected—here, the prosecutor's closing arguments—must in and of itself risked prejudicing Paige.

1    homicide to that of first-degree." *Id*. at 32. Though Paige concedes the jury was given proper

2    instructions regarding voluntary intoxication, he argues it nonetheless lacked the means to genuinely

3    assess how intoxication intersects with premeditation and deliberation. *Id*. at 32.

4         Paige raised this claim in his habeas petition before the California Supreme Court. Petition

5    to the California Supreme Court at 130. The California Supreme Court denied Paige's claim without

6    issuing a reasoned opinion. California Supreme Court Habeas Order. Paige also raised this claim in

7    his habeas petition to the Superior Court. Petition to the Superior Court at 6.[3] The Superior Court

8    dismissed Paige's claims in a reasoned opinion. Superior Court Opinion at 10. Accordingly, this

9    Court "look[s] to the last reasoned state-court decision that finally resolves the claim at issue," the

10   Court of Appeal Opinion. *Garrett v. Madden*, No. 20-55578, 2021 WL 2555647, at *1 (9th Cir. June

11   22, 2021) (citing *Wilson*, 138 S. Ct. at 1192); *see also Ylst*, 501 U.S. at 806.

12        When dismissing Paige's claim, the Superior Court explained

13            "Petitioner [] appears to summarily argue that trial counsel should
             have had an expert witness regarding the effect of his intoxication.
14            However, Petitioner was not prejudiced in this regard there is
             nothing to indicate that the outcome of the trial would have been any
15            different had such an expert been produced."

16   Superior Court Opinion at 10.

17        The Court concludes that the Superior Court reasonably applied *Strickland* when it rejected

18   Paige's present ineffective assistance claim. Criminal defense counsel "has a duty to make

19   reasonable investigations or reasonable decisions that make particular investigations unnecessary,"

20   *Strickland*, 466 U.S. at 691, so as to enable counsel "to make informed decisions about how to best

21   represent his [or her] client." *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) (internal quotation

22

23   ─────────────────────

24   [3] The government does not acknowledge the Superior Court's habeas opinion and instead argues
     that this Court should review the California Supreme Court's summary denial of this claim under
     *Harrington*. Resp. at 21 (citing *Harrington*, 562 U.S. at 102). However, Petitioner appears to have
25   raised this claim in his habeas petition to the Superior Court, Petition to the Superior Court at 6,
     which addressed the claim in a reasoned opinion, Superior Court Opinion at 10.

United States District Court
Northern District of California

marks and citation omitted). Deficient performance is rendered where the lawyer "fails adequately to investigate and introduce ... evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict [.]" *Duncan v. Ornoski*, 528 F.3d 1222, 1234 (9th Cir. 2008) (internal quotation marks, brackets and citation omitted); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir.1995) ("An attorney must ... provide factual support for the defense where such corroboration is available. Failure to pursue such corroborating evidence with an adequate pretrial investigation may establish constitutionally deficient performance." (internal quotation marks, brackets and citation omitted)).

The duty to investigate and prepare a defense, however, "is not limitless: it does not necessarily require that every conceivable witness be interviewed." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.2001) (internal quotation marks and citation omitted); *see also Riley v. Payne*, 352 F.3d 1313, 1318 (9th Cir.2003) (same). Lawyers are allowed "considerable discretion to make strategic decisions about what to investigate," provided that "[the] lawyer[ ][has] gathered sufficient evidence upon which to base their tactical choices." *Duncan*, 528 F.3d at 1235 (9th Cir. 2008) (internal quotation marks and citation omitted); *see Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." (quoting *Strickland*, 466 U.S. at 690) (alterations and internal marks omitted)). "[T]here is no expectation that competent counsel will be a flawless strategist or tactician." *Harrington*, 562 U.S. at 110.

To show prejudice based on counsel's alleged failure to investigate, a petitioner must demonstrate that further investigation would have revealed favorable evidence. *Ceja v. Stewart*, 97 F.3d 1246, 1255 (9th Cir.1996); *Hendricks*, 70 F.3d at 1042. Mere speculation or conclusory allegations are insufficient in this regard. *See Jackson v. Calderon*, 211 F.3d 1148, 1155 (9th Cir. 2000); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994). "Ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." *Rios*, 299 F.3d

United States District Court
Northern District of California

at 808–09 (quotation marks and citation omitted). Thus, the court "examine[s] the evidence that could have been presented to the jury had counsel performed competently and compares that to the evidence that the jury actually heard. If the difference between the evidence that could have been presented and that which actually was presented is sufficient to 'undermine confidence in the outcome' of the proceeding, the prejudice prong is satisfied." *Duncan*, 528 F.3d at 1240 (quoting *Strickland*, 466 U.S. at 694) (internal citation omitted).

To prove prejudice, it is not enough to show that counsel's errors had some conceivable effect on the outcome of the trial. *Strickland,* 466 U.S. at 693. Rather, Petitioner must show "that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Harrington,* 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable." (citing *Strickland,* 466 U.S. at 693)).

The record here shows that the state court's rejection of this claim is consistent with the foregoing authority. Paige argues that voluntary intoxication was "central to his defense [but] was wholly unsupported without the benefit of actual expert testimony." Pet. at 34. But Paige testified that he was in control of his faculties during the shooting and that he fired the gun to scare Bradford, not kill him. ECF 10, Ex. 3B at 475-76, 545. To this end, Paige testified "[t]he reason I shot at him [was] because I feared for my friend. I didn't know what his intent was to do or how he was going to approach, you know." *Id*. at 476; *see also id*. at 495-497 (testifying about being concerned for Burch's safety). And when asked on cross-examination whether he "underst[ood] that this is your time to explain that you were high and drunk out of your mind, right?", Paige responded "Yes, sir. *I was not out of my mind. I was functional*, but I was high, yeah." *Id*. at 545 (emphasis added). Paige described himself as "functional" at the time of the shooting four times during his testimony at trial. *Id*. at 545-46. In closing, defense counsel dedicated a single paragraph to the issue of voluntary intoxication in which he explicitly acknowledged Paige's testimony that "he was functioning." ECF

10, Ex. 3C at 631 ("Of course he said he was functioning, but he certainly said he was high, I think you can reasonably conclude that he was high."). Counsel dedicated far more time discussing whether Paige committed voluntary manslaughter in attempting to protect Burch. *Id*. at 624-629. Further, the jury was instructed on voluntary intoxication and Paige does not challenge the court's instruction. Pet. at 31.

Given the defense theory of the case, Paige's contradictory testimony at trial, and the otherwise proper jury instructions on intoxication, the Court has no reason to find that the Superior Court was irrational in finding trial counsel's failure to procure a toxicology expert was not prejudicial. Paige's second claim for ineffective assistance of counsel fails.

### D.    Cumulative Error

Paige does not explicitly bring a discrete cumulative error claim. Nonetheless, because he makes various references to the effect of cumulative errors, *see, e.g.,* Pet. at 31 ("reversal of Paige's conviction is warranted based on the cumulative prejudice of the misconduct coupled with the evidence, particularly in light of all the lesser included offense options the jury had to choose from in deciding what crime Paige committed."), the Court briefly addresses it here. *See De La Cruz v. Montgomery*, No. EDCV152650DMGJEM, 2018 WL 2422605, at *14 n. 5 (C.D. Cal. Jan. 25, 2018), *report and recommendation adopted*, No. EDCV152650DMGJEM, 2018 WL 2446647 (C.D. Cal. May 29, 2018) (addressing cumulative error claim argued but not explicitly brought).

The Court of Appeal considered and rejected a cumulative error claim by Paige on appeal. Court of Appeal Opinion at 16; *see also* Opening Brief on Appeal at 42-45. As part of this decision, the Court of Appeal recognized several trial errors, but concluded that, considered separately or cumulatively, they did rise to the level of prejudicial error given the "overwhelming evidence against defendant." Court of Appeal Opinion at 16. The cumulative error claim before the Court of Appeal is not identical to the cumulative error claim before this Court now, as the Court of Appeal did not consider any error derived from trial counsel's failure to investigate and retain a toxicologist. Paige

did not raise a cumulative error claim in his habeas petition to the California Supreme Court. *See* Petition to the California Supreme Court. The cumulative error claim before this Court is thus unexhausted. *See Lounsbury v. Thompson*, 374 F.3d 785, 787 (9th Cir.2004); *Wooten v. Kirkland*, 540 F.3d 1019, 1025 (9th Cir. 2008). The Court need not dwell on this procedural flaw, however. "[A] federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see, e.g., Brandon v. Arnold*, No. 14-CV-00172-SBA(PR), 2017 WL 1196808, at *19 (N.D. Cal. Mar. 30, 2017) (applying *Cassett*); *Vlahos-Schmidt v. Larkin*, No. 14-CV-05184-EMC, 2016 WL 3951646, at *15 (N.D. Cal. July 22, 2016) (same); *Gonzalez v. Yates*, No. C 11-02670 JSW PR, 2013 WL 1451163, at *12 (N.D. Cal. Apr. 9, 2013) (same); *Lee v. Adams*, No. C 08-1200PJHPR, 2009 WL 3762416, at *5 (N.D. Cal. Nov. 9, 2009) (same). Such is the case here.

"Cumulative error applies where, 'although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still prejudice[d] a defendant.'" *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000) (quoting *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)). "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Parle v. Runnels*, 505 F.3d 922, 933 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 290 n. 3). "Under traditional due process principles, cumulative error warrants habeas relief only where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id*. (quoting *Donnelly*, 416 U.S. at 643). "Such 'infection' occurs where the combined effect of the errors had a 'substantial and injurious effect or influence on the jury's verdict.'" *Id*. (citing *Brecht v. Abrahamson*, 507 U.S.

United States District Court
Northern District of California

619, 637 (internal quotations omitted)). "In simpler terms, where the combined effect of individually harmless errors renders a criminal defense 'far less persuasive than it might [otherwise] have been,' the resulting conviction violates due process." *Id.* (quoting *Chambers*, 410 U.S. at 294, 302–03). "In evaluating a due process challenge based on the cumulative effect of multiple trial errors, a reviewing court must determine the relative harm caused by the errors. If the evidence of guilt is otherwise overwhelming, the errors are considered 'harmless' and the conviction will generally be affirmed." *Id.* (citations omitted).

Considered together, the errors alleged by Paige did not have a cumulative impact that "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Paige does not challenge the state court's determination that the evidence against him was otherwise "overwhelming." Court of Appeal Opinion at 16; *see United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) ("In those cases where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." (citing *United States v. Berry*, 627 F.2d 193, 201 (9th Cir.1980))). Nor does Paige contend that there is a "'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (quoting *Parle*, 505 F.3d at 933). The Court denies habeas relief on this ground.

### E.    Certificate of Appealability

No certificate of appealability is warranted in this case. *See* Rule 11(a) of the Rules Governing § 2254 Cases (requiring district court to rule on certificate of appealability in same order that denies petition). Paige has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

### IV.    ORDER

United States District Court
Northern District of California

1    For the foregoing reasons, IT IS HEREBY ORDERED that:

2    (1) Paige's petition for a writ of habeas corpus is DENIED;

3    (2) A certificate of appealability is DENIED; and

4    (3) The Clerk shall enter judgment and close the file.

5
Dated: August 23, 2021

6

7    BETH LABSON FREEMAN
     United States District Judge